## IN THE UNITED STATES DISTRICT
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **KEVIN RENTFRO,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:13-CV-01425** |
| | ) | |
| **JAY CASSADY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## PETITIONER'S FIRST AMENDED PETITION FOR
## A WRIT OF HABEAS CORPUS

COMES NOW petitioner, Kevin Rentfro, by and through counsel, and submits to the Court the following first amended petition for a writ of habeas corpus challenging his unconstitutional convictions for the offenses of murder in the second degree and armed criminal action and his sentence of life imprisonment.

Petitioner is confined at the Jefferson City Correctional Center in the custody of respondent pursuant to a judgment and sentence imposed by the Circuit Court of St. Charles County, Missouri in 2001 and is being denied his liberty pursuant to these unconstitutional convictions and sentences of life imprisonment.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

## A.    PROCEDURAL HISTORY

In cause No. CR100-154FX, petitioner, Kevin Rentfro, was charged by information in the Circuit Court of St. Charles County with the Class A felony of

murder in the second degree and the unclassified felony of armed criminal action. (D.A.L.F. 1).[1]  These charges alleged that petitioner killed his wife, Sherri L. Rentfro by shooting her on February 27, 1997, in the couple's residence in St. Charles County, Missouri.  Petitioner retained St. Louis attorney Neil Bruntrager to represent him at trial.

Petitioner proceeded to trial on January 22, 2001 in the Circuit Court of St. Charles County before the Honorable Ellsworth Cundiff and a jury.  The jury returned a verdict finding petitioner guilty as charged on both offenses on January 26, 2001.  On May 21, 2001, Judge Cundiff sentenced petitioner to concurrent sentences of life imprisonment.  (D.A.L.F. 69-70).

Petitioner's convictions were affirmed on direct appeal by the Missouri Court of Appeals, Eastern District on May 21, 2002 in *State v. Rentfro*, 83 S.W.3d 28 (Mo. App. E.D. 2002) in an unpublished memorandum opinion.  After rehearing and transfer were denied, that court issued its mandate on October 4, 2002.  Petitioner thereafter commenced a post-conviction action pursuant to Rule 29.15 by filing a timely *pro se* motion for post-conviction relief before the trial court on December 19, 2002.  (29.15 L.F. 8).  An amended motion for post-conviction relief pursuant to Rule 29.15 was filed on February 14, 2003 by

---

[1] Citations to the record will be as follows:  the 29.15 hearing transcript will be "29.15 Tr."; the 29.15 legal file will be "29.15 L.F."; legal file from the direct appeal will be "D.A.L.F."; the trial transcript will be "Tr."; and the separate transcript of the closing arguments at trial will be designated as "Arg. Tr."

2

previously retained counsel Arthur Margulis of St. Louis.  (*Id*. 12).  A second amended motion was filed by Mr. Margulis on July 11, 2003.  (*Id*. 35).

Petitioner's 29.15 action inexplicably languished on the circuit court's docket for over eight years before an evidentiary hearing was finally scheduled and conducted on July 26, 2011.  On two separate occasions, the court below placed the case on a dismissal docket due to Mr. Margulis' failure to prosecute the case.  (*Id*. 68-76).

An evidentiary hearing was conducted on petitioner's 29.15 motion on July 26, 2011 before Judge Ted House.  On August 9, 2011, Judge House issued findings of fact and conclusions of law and a judgment denying petitioner's motion for post-conviction relief.  (*Id*. 102).  Judge House, *sua sponte*, issued new findings and conclusions and an amended judgment on August 17, 2011.  (*Id*. 108).

Petitioner, through newly retained counsel, filed a timely motion for a new trial pursuant to Mo. S. Ct. Rule 78 on September 15, 2011.  (114-201).  After Judge House failed to rule on the motion within ninety days, petitioner filed a timely notice of appeal on December 14, 2011.  (*Id*. 213).

On November 27, 2012, the Missouri Court of Appeals, Eastern District, affirmed the judgment of the Circuit Court denying petitioner's Rule 29.15 motion in a *per curiam* unpublished opinion.  *Rentfro v. State*, No. ED97796.  The Court of Appeals subsequently denied rehearing and transfer on January 16, 2013.  The

3

Missouri Supreme Court subsequently denied petitioner's application for transfer on February 26, 2013.  *Rentfro v. State*, No. SC93100.

## B.    THE TRIAL

Before addressing the factual and legal issues presented in this petition, it is necessary to briefly outline the evidence presented at petitioner's 2001 trial.  The evidence utilized to convict petitioner of murder and armed criminal action in the shooting death of his wife was entirely circumstantial.  The prosecution contended that the physical and forensic evidence indicated that petitioner shot his wife.  Petitioner contended, consistent with his prior statements to the police, that during a night of drinking after a heated argument, his wife committed suicide by shooting herself in the left temple.  (Trial Tr. 300-310, 333-354, 733-754).  The outcome of the case undoubtedly hinged upon a "battle of experts" on the significance of blood spatter evidence on petitioner's clothing.

The state retained as an expert witness Rodney Englert, a retired Oregon police officer, who described himself as an independent "forensic crime scene reconstuctionist."   Based upon Mr. Englert's findings and conclusions, which contradicted the prior conclusions reached by the police who investigated Mrs. Rentfro's death, the St. Charles County prosecutor elected to charge petitioner with murder nearly three years after the death of his wife.  (D.A.L.F. 11-12).

4

Mr. Englert testified at trial that the blood stains on petitioner's clothing could only have been caused by blood spatter from a gunshot wound. (Trial Tr. 623-624). Mr. Englert also testified that, in his opinion, Mrs. Rentfro did not commit suicide because there was no blood spatter on her left hand. (*Id*. 642-645).

Petitioner's trial counsel retained Paul Kish, a forensic expert from Corning, New York to testify as a defense witness regarding the blood spatter evidence. *Id*. 819. Mr. Kish directly contradicted Mr. Englert's testimony. In relevant part, Mr. Kish testified that blood spatter is unusual in contact wounds such as the one to the Mrs. Rentfro's left temple. Mr. Kish testified that blood spatter only occurs approximately twenty percent of the time in contact gunshot wound cases. (*Id*. 849).

In Mr. Kish's opinion, the blood spatter on petitioner's clothing was caused by expired blood. (*Id*. 859-862). Mr. Kish described expired blood as being created when an individual has blood in their nose or mouth and "they breathe out or cough or sneeze." (*Id*.). In expired blood cases, there are larger spots and a "very, very fine spatter." (*Id*. 854-855, 979).

After examining the blood spatter on Mr. Rentfro's clothing, Mr. Kish testified that the patterns he observed were not consistent with the normal high velocity impact patterns that are associated with gunshot wounds. (*Id*. 879, 893). Instead, Mr. Kish testified that the blood spatter distribution on Mr. Rentfro's

5

clothing was consistent with petitioner's statement to the police that this blood spatter was created by expired blood from his wife's mouth and nose which occurred during his efforts to resuscitate her.  (*Id*. 878-879, 883, 895-896, 981-982).

The prosecution also presented evidence from the autopsy that Mrs. Rentfro had a BAC of .399, which the medical examiner opined would render many people either dead or unconscious.  (Tr. 690-694).  The prosecution also presented evidence of gunshot residue (GSR) tests performed on both Mrs. and Mr. Rentfro. (*Id*. 388-391, 488-514, 548-565).  The prosecution expert testified that no GSR was present on Mrs. Rentfro's hands.  (*Id*. 550-553).  GSR tests on Mr. Rentfro's hands were inconclusive.  (*Id*. at 558).  However, a small amount of barium was found on the back of Mr. Rentfro's left hand.  (*Id*.).

## C.   THE STATE POST-CONVICTION PROCEEDING

As noted earlier, Mr. Margulis, after filing two amended motions for post-conviction relief on behalf of petitioner, allowed the case to remain inactive before the circuit court for more than eight years before a hearing was finally held on July 26, 2011.  (29.15 L.F. 1-7).  At a prehearing conference on July 21, 2011, Mr. Margulis agree to waive all of petitioner's claims for post-conviction relief[2] except

---

[2] The claims abandoned by Mr. Margulis included ineffective assistance of counsel claims involving juror misconduct, trial counsel's failure to investigate and present expert testimony on gunshot residue and toxicology, and counsel's failure

for a single ineffectiveness claim involving trial counsel's failures to discover and pursue distortions, omissions, and misrepresentations regarding Rodney Englert's qualifications as an expert.  (*Id*. 97-99).   At the July 26, 2011 hearing, Mr. Margulis called two witnesses, petitioner's trial counsel Neil Bruntrager and New York criminal defense attorney Donald George Rehkopf, Jr.  (29.15 Tr. 6-22).

Mr. Margulis' direct examination of trial counsel took less than eight pages to transcribe.  (*Id*. 6-14).  In his testimony, Mr. Bruntrager admitted that he did not cross-examine Mr. Englert regarding his qualifications at trial and did not recall asking him about his qualifications during two pretrial depositions.  (*Id*. 10-14). Mr. Bruntrager indicated that he did not investigate or bring up the issue of Mr. Englert's background or qualifications as an expert because Judge Cundiff had previously made it clear that he was going to allow him to testify as an expert.  (*Id*. at 12-13).  The transcript of Mr. Rentfro's trial demonstrates that Mr. Bruntrager did not make any motion or objection under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) challenging either Mr. Englert's qualifications or his methodology.  *See State v. Daniels*, 179 S.W.3d 273, 281 (Mo. App. W.D. 2005) (Challenge to admissibility of scientific evidence and expert testimony is conducted in Missouri in a *Frye* hearing "held outside the presence of the jury.").

---

to present evidence of Mrs. Rentfro's mental illness and previous suicide attempt. (29.15 L.F. 14-31).

The second witness called by Mr. Margulis was Mr. Rehkopf.  Mr. Rehkopf is a veteran criminal defense attorney from Rochester, New York.  (*Id*. 15).  Mr. Rehkopf also had extensive criminal trial experience during his military service in the JAG Corps.  (*Id*. 16-17).

When Mr. Rehkopf was questioned on direct examination regarding his knowledge and experiences with Mr. Englert, the prosecution objected.  (*Id*. 17-19).  This objection by the prosecution urged the motion court to exclude Mr. Rehkopf's testimony because it was improper under Missouri law to have an attorney testify as an expert on trial tactics and advocacy because it invades the province of the finder of fact.  (*Id*.).  In response to this objection, Mr. Margulis failed to point out to the court that Mr. Rehkopf was not testifying as a legal expert, but instead intended to provide the motion court with details regarding his investigation of Mr. Englert's background and qualifications which he had uncovered in previous criminal cases he had handled where Englert testified.  (29.15 L.F. 126-201).  After the trial court sustained this objection, Mr. Margulis inexplicably and incompetently failed to make an offer of proof through Mr. Rehkopf's testimony regarding the substance of the testimony he wished to present through this witness.  (29.15 Tr. at 19-21).

Thereafter, the prosecutor noted that Mr. Margulis had failed to present any evidence to support a finding of *Strickland* prejudice.  (*Id*. 21).  The motion court

8

took the case under advisement and requested the state to provide the court with proposed findings of fact and conclusions of law within thirty days.[3]  (*Id*. 21-22). The trial court, thereafter, entered findings of fact and conclusions of law and a judgment denying post-conviction relief on August 9, 2011.  (29.15 L.F. 102).  The trial court thereafter, *sua sponte*, issued new findings of fact, conclusions of law and an amended judgment on August 17, 2011.  (*Id*. 108).

Soon thereafter, petitioner discharged Mr. Margulis and retained the undersigned counsel to represent him.   The undersigned counsel entered his appearance on petitioner's behalf in the circuit court on September 6, 2011.  (*Id*. 113).  On September 15, 2011, the undersigned counsel filed a timely motion for new trial pursuant to Mo. S. Ct. Rules 78.01, 78.04, and 78.05, which urged the court below to vacate its prior amended judgment and reopen the case and take additional testimony because the trial court abused its discretion in excluding Mr. Rehkopf's testimony and because Mr. Margulis abandoned petitioner and was constitutionally ineffective by waiving all but one of petitioner's claims for relief and in incompetently failing to make an offer of proof in order to properly preserve the one unabandoned claim for appellate review.  (*Id*. 117-125).  Exhibit 1 attached to this post-judgment motion was Mr. Rehkopf's affidavit, CV, prehearing report,

---

[3] It is unclear whether the state submitted proposed findings to the court in chambers prior to the judgment because no proposed findings were filed by the State with the circuit clerk.  (L.F. 6).

and deposition.  (*Id*. 126-201).  This exhibit set forth the substance of the testimony Mr. Rehkopf would have provided to the motion court had he been permitted to testify either directly or through an offer of proof.  (*Id*.).

Had he been allowed to testify at the hearing, Mr. Rehkopf would have testified that he first encountered Rodney Englert in 2000 when he was contacted about representing Kevin Holt, who was convicted of murder in 1993 in a military court-martial primarily based upon the testimony of Mr. Englert.  (*Id*. 127-128).  In reviewing Mr. Holt's case, Mr. Rehkopf conducted an extensive background investigation of Mr. Englert by conducting internet searches and contacting defense counsel in prior cases where Mr. Englert had testified as a prosecution witness.  (*Id*. 128).  After conducting this initial background investigation of Mr. Englert, Mr. Rehkopf's affidavit indicated:  "Three things became apparent to me: (1) Englert's purported 'expert' testimony was frequently gibberish; (2) his alleged academic credentials – especially in the hard sciences necessary for forensic work [biology, chemistry, physics] as well as basic algebra and geometry – were suspect; and (3) he routinely claimed an association with Professor Herbert L. MacDonell, one the nation's leading forensic blood spatter experts."  (*Id*.).

Mr. Rehkopf contacted Professor MacDonell in late 2002 or 2003.  (*Id*. 128-129).  After explaining to Professor MacDonell the purpose of his call, Professor MacDonell got quite emotional, insisting that Englert was not "associated" with

10

him in any way, but that he had created a "Frankenstein" because Englert had been a blood spatter student of his.  Professor MacDonell referred to Mr. Englert as "a liar for hire, the Bin Laden of bloodstains, and repeatedly commented on Englert's total lack of scientific background." (*Id*. 129).

Professor MacDonell also gave Mr. Rehkopf the names of a couple of other criminal defense attorneys who were familiar with Mr. Englert.  After reading a deposition in a North Carolina case, Mr. Rehkopf discovered that Englert often significantly overstated his academic credentials.  (*Id*.).  After placing an inquiry on the NACDL list serve, Mr. Rehkopf received numerous responses from several criminal defense attorneys indicating "that Englert was not a qualified expert, he would ignore facts/evidence inconsistent with his theories and that on the witness stand, if you were not prepared and were not paying attention, his testimony would be nonresponsive and inject all kinds of prejudicial material into the record." (*Id*.).

In May or June of 2003, Mr. Rehkopf made contact with Andrea Rentfro, who was at that time married to petitioner, and was also looking for background information regarding Mr. Englert.  (*Id*.).  After contacting Mrs. Rentfro, Mr. Rehkopf became involved in Kevin Rentfro's post-conviction proceedings.  Mr. Rehkopf agreed to become a witness for Mr. Rentfro at his upcoming 29.15 hearing regarding his knowledge and investigation of Mr. Englert's background and lack of credentials.  (*Id*. 129-130).

11

Before the evidentiary hearing in this case, Mr. Rehkopf had the opportunity to cross-examine Mr. Englert at length in the 2008 premeditated murder trial of *United States v. Hurley* that was prosecuted in the state of Washington.  (*Id*. 130). In preparing to cross-examine Mr. Englert, Mr. Rehkopf subpoenaed all official school transcripts for each educational institution that Mr. Englert had listed on his CV.  The following chart prepared by Mr. Rehkopf, sets forth specific examples of Mr. Englert's false or misleading testimony at petitioner's trial that a reasonably competent trial counsel would have investigated, uncovered, and presented to the jury:

| Englert's Trial Testimony | Prejudice to Rentfro |
|---|---|
| "I have an associates of arts degree from East Los Angeles Junior College." <br> Tr. 568 | · Mr. Rehkopf subpoenaed Englert's records from that institution in *United States v. Hurley* - they have no record of him ever *attending* much less receiving a degree. Prior counsel could have done the same and confronted Englert at trial. |
| "I have a bachelor of science degree in police administration with a psychology minor." <br> *Id*. | · That degree is from California State University in Los Angeles – only his transcript [subpoenaed in *Hurley*] does not reflect any "psychology minor." |
| "I have post-graduate work . . ." <br> *Id*. | · "Post-graduate work" is the key phrase and very misleading – it was *not* in any branch of forensic science. |
| ". . . at the University of Virginia" <br> *Id*. | · Had counsel "investigated," he would have seen that the classes at the University of Virginia were "continuing education" level classes held at the FBI campus at *Quantico*, VA, not at the University of Virginia's campus – again, overstating his purported academic qualifications. |

| | |
|---|---|
| ". . . California State University at Fullerton . . ."<br>*Id.* | · Records subpoenaed by Mr. Rehkopf in *U.S. v. Hurley* showed that Cal State Fullerton had *no records* of him ever attending that university. |
| ". . . and also at Portland State University . . ."<br>*Id.* | · Records subpoenaed by Mr. Rehkopf in *U.S. v. Hurley* showed that he took *three psychology* classes there, "Individual Differences," "Abnormal Psychology," and "The Psychology of Women." None involved any aspect of forensic science or crime scene reconstruction. |
| "The laboratory which I worked . . ."<br>Tr. 569 | · There was and is no "crime lab" in the Multnomah County (Oregon) Sheriff's Dept. where Englert worked. Mr. Rehkopf verified this with James Pex, M.S., who is a retired Lab Director for the Oregon Police Crime Lab, who knows Englert from his sheriff's days and because the State Lab did Multnomah County's work. Had counsel done a background investigation, he would have known Englert was exaggerating if not prevaricating. |
| "Q:  Do you have an opinion within a reasonable degree of *scientific certainty* as to what would have caused those patterns?<br><br>A:  That is high velocity mist from a gunshot."<br>*Rentfro* [Tr. 622] | · Englert is *NOT* a "scientist" so how could he render any opinion to any degree of scientific certainty?"<br>Q:  Mr. Englert, you're not a scientist are you?<br>A:  No, sir, I am not. [*U.S. v. Hurley* Tr. 2156]<br>        * * * * *<br>Q:  You are not a scientist are you?<br>A:  I'm not a scientist.<br>Q:  You have no scientific background?<br>A:  No, sir, I do not. [*U.S. v. Hurley* Tr. 2157]<br>        (testimony, 2008)<br>· The prejudice to Petitioner is that the jury was hoodwinked into believing that Englert had some scientific expertise, *i.e.*, an "expert" when in fact he was not. |
| ". . . it violates the laws of physics."<br>*Rentfro* [Tr. 653] | · How would someone who has never taken a physics class in his life *know* what "violate[d] the laws of physics?" Had counsel done *basic* |

13

| | |
|---|---|
| | background research, he would have learned this and entered an appropriate objection.<br>· Again, the prejudice here is that the jury was misled into thinking that Englert possessed some scientific expertise in physics on a key, disputed issue at trial.<br>Q:  What are your qualifications in chemistry?<br>A:  I have none, I'm not chemists. (sic)<br>Q:  What are your qualifications in physics?<br>A:  I have none, I am not a physicist.<br><div align="right">*U.S. v. Hurley* (2008), Tr. 2159</div> |
| Q:  "In your opinion, could anything else cause that except that spatter from high velocity gunshot wound? (sic)<br><br>A:  No, sir, it cannot."<br><div align="right">*Rentfro* [Tr. 622-23]</div> | · This is a lie that went undetected due to his lack of preparation. Counsel was unprepared to **prove** the lie and was ineffective in not confronting him with his prior inconsistent statement from his pre-trial deposition in this very case:<br>Q:  It [expired blood] can create a pattern of high velocity?<br>A:  Sometimes.<br><div align="right">Englert Depo, 15 JAN 01, R.35</div>· The prejudice here was twofold: first, the failure to impeach Englert for what he was, a liar. Second, the jury's verdict was tainted by false evidence. |
| Q:  "In your opinion could anything else cause that?<br><br>A:  No."<br><div align="right">*Rentfro* [Tr. 626-27]</div> | · This testimony not only contradicted Englert's deposition in *Rentfro*, but also directly contradicted prior sworn testimony that Englert gave in two trials prior to Rentfro's, where he also testified as an "expert":<br><br>- "But, you can have blood out of the nose or mouth that is similar to high velocity misting."<br><div align="right">*Washington v. Larry Clark*, at 86 (1997)</div><br>- "[T]he motion of coughing or sneezing. It can also be coughed out. And it creates the same phenomenon or same pattern sometimes, medium or high velocity blood spatters. **Blood** |

<div align="center">14</div>

| | |
|---|---|
| | *spatters from a sneeze are high velocity*."<br>*NY v. Jerry Bonton*, at 1163 (2000)<br><br>· The prejudice to Petitioner was that not only was Englert not impeached, but he was not impeached by his own sworn testimony, which would have *corroborated* the testimony of Petitioner's blood-spatter expert at his trial. |
| Englert testified at length about his use of "luminal" *vis-à-vis* his blood-spatter evidence.<br>Tr. 628 *et seq.* | · If "luminol" is a factor, any reasonably competent defense counsel has a duty to learn about it, what it does, how it works, when it is contraindicated and what, if any, adverse effects it may have on physical evidence involved. |
| Q:  "And those areas that are luminescing, glowing, that would be where the blood is?<br><br>A:  Yes . . ."<br>*Rentfro* [Tr. 634] | · Luminol is only a ***presumptive*** test for blood and a fairly non-distinguishing one at that. Many things ***besides*** blood cause the luminol to react, *e.g.*, horseradish, bleach, iron compounds, copper compounds, etc.  *See*: http://chemistry.about.com/od/glowinthedarkprojects/a/luminolblood.htm<br>· Here, without objection, he's *assuming* that what was "glowing" was blood. There is *zero* proof that what was "glowing" ***was*** blood and it surely called for an objection at trial. He is assuming a fact, not in evidence, thus "foundational." Any reasonably competent defense counsel would have been prepared to challenge luminol in a pre-trial *Frye* hearing as only a non-specific, screening test. *See State v. Daniels*, 179 S.W.3d 273, 280-285 (Mo. App. W.D. 2005). |
| A:  "That is a classical pattern of high velocity mist displayed by the use of luminol."<br>*Rentfro* [Tr. 636] | · ***Spraying*** luminol on something that will cause it to chemically luminesce, will produce a ***false*** appearance of "mist" because the luminol is sprayed on the subject item ***as a mist***. Anyone who worked with luminal testing who was ethical would have told counsel that. *Prepared* counsel would have known of this "mist" fallacy *and* would have |

15

| | been prepared to confront Englert with it. |
|---|---|
| Q:  "Do you attach any significance to the *fact* that the hand is at the side of the body if she was supposed to have shot herself in the head with that hand?<br><br>A:  The significance is, in my opinion, *she did not shoot herself*."<br>*Rentfro* [Tr. 644] | · The defense was asleep here and this is where the trial was lost. The "fact" that when the photos were taken some time later, her left hand was by her left side, is ***totally irrelevant*** to the actual issue: where was her left hand at the time the shot was fired or immediately thereafter? The photos prove that it was **NOT** at her left side.<br>· This falsely assumes that the left hand was ***not moved*** – which simply was not the case. While an "opinion," it was based upon a ***false fact*** – and perpetuated a fraud on the fact-finder – something that was totally *unreasonable* for counsel NOT to have challenged, either by *voir dire* or by a specific objection.<br>· This is especially ineffective considering the testimony of SGT Luetkenhaus at Petitioner's trial, who testified *prior* to Englert:<br><br>A:  Could you tell me, please, Sergeant, who moved her hand then?<br>A:  I don't know.<br>Q:  But you agree with me that her hand is in two very different positions?<br>A:  It is in the photograph, yes.<br>Q:  The photographs that you took?<br>A:  Yes.<br>*Rentfro* [Tr. 460]<br><br>· A reasonably competent and prepared defense counsel would have impeached Englert with his deposition testimony, to wit: that as a "crime scene reconstructionist" [Depo 18 FEB 00, R.5], he "cannot duplicate the shooter's position" [*Id*. at 57]. Therefore, he had no basis to opine on who fired the fatal shot. |

Mr. Rehkopf's entire forty page report, detailing numerous other issues that could have been utilized to discredit Mr. Englert, was provided to Mr. Margulis before the evidentiary hearing and was attached to petitioner's post-judgment motion in his 29.15 action.  (29.15 L.F. 130, 144-183).

Mr. Rehkopf was quite dismayed at the developments at the July 26, 2012 hearing after he was not permitted to testify.  (*Id*. 132).  Mr. Rehkopf indicated that he was shocked by the fact that Mr. Margulis never argued that his proposed testimony was not about legal questions but instead involved the facts he uncovered regarding Mr. Englert that demonstrated prior counsel's deficient investigation and *Strickland* prejudice.  (*Id*.).  Mr. Rehkopf also indicated that: "After the court sustained the prosecution's objection, I was shocked beyond belief as every minimally qualified trial lawyer should know that for preservation purposes, to have at least made a request to proffer the expected testimony that had just been precluded."  (*Id*.).  Mr. Rehkopf also indicated that, in his later contacts with Mr. Margulis, that Mr. Margulis refused to file any post-judgment motions or file a notice of appeal.  (*Id*. 132-134).  Based upon these developments, Mr. Rehkopf advised petitioner's family to immediately retain new counsel because Mr. Margulis indicated clearly that he was going to do no more work on the case and would not file a notice of appeal.  (*Id*. 133-134).

In petitioner's 29.15 appeal, newly retained undersigned counsel raised two points of error. The first point contended that the 29.15 motion court clearly erred in precluding Mr. Rehkopf from testifying on the issues of deficient performance and prejudice pertaining to trial counsel's failure to attack the credentials and credibility of Rodney Englert and in failing to grant petitioner's post-judgment motion in his 29.15 proceeding based upon the substance of Mr. Rehkopf's testimony. Petitioner's second point of error alleged that the 29.15 action should be remanded for a new 29.15 proceeding because Mr. Margulis was ineffective and abandoned him by waiving all but one of his claims of ineffective assistance of counsel and in failing to present any evidence either directly or through an offer of proof from Mr. Rehkopf on the issues of *Strickland* performance and prejudice and trial counsel's failure to investigate and discredit Mr. Englert. *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

The Missouri Court of Appeals, in addressing petitioner's first point of error, ruled that Mr. Rehkopf's testimony regarding his investigation of Mr. Englert in other cases was inadmissable. Thereafter, the Court of Appeals proceeded to address the merits of the underlying ineffective assistance of trial counsel claim and found that it lacked merit. *Rentfro v. State*, *supra*., slip op. at 5-7.

In addressing petitioner's second point of error, the Missouri Court of Appeals rejected petitioner's argument that he was abandoned by Mr. Margulis

18

during his 29.15 proceedings.  The Court of Appeals noted that these allegations against Mr. Margulis involved claims of ineffective assistance of post-conviction counsel which are categorically unreviewable under Missouri law.  *Id*. at 7-9.

Petitioner commenced the present federal habeas action by filing a timely *pro se* petition.  Undersigned counsel entered his appearance and this Court granted him leave to file an amended petition.  The present first amended petition for a writ of habeas corpus is now before the Court for review.

## PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner's convictions and sentences were secured in violation of his Sixth and Fourteenth Amendment rights in the following respects:

## CLAIM 1

**TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE TO ATTACK THE CREDIBILITY AND CREDENTIALS OF THE PROSECUTION'S BLOOD SPATTER EXPERT RODNEY ENGLERT.  HAD MR. ENGLERT BEEN DISCREDITED WITH AVAILABLE EVIDENCE AND TESTIMONY FROM OTHER TRIALS THAT DIRECTLY CONTRADICTED HIS TESTIMONY IN THIS CASE, THERE IS A REASONABLE PROBABILITY THAT PETITIONER WOULD HAVE BEEN ACQUITTED.**

As noted earlier, trial counsel candidly admitted in his post-conviction testimony that he did very little to investigate the background and prior testimony given by the prosecution's so-called "expert" Rodney Englert.  Had he done so, he would have uncovered the same powerful impeachment evidence that was

uncovered by Mr. Rehkopf who thoroughly investigated Mr. Englert's background in connection with his representation of one of his clients.

In reviewing this issue, the court must be guided by the familiar test of *Strickland v. Washington*, 466 U.S. 668, 694 (1984).   Under the two-part *Strickland* test, the court must consider whether trial counsel's performance was objectively unreasonable and whether the defendant was prejudiced thereby.  *Id.*

As noted earlier, evidence was presented at the 29.15 proceeding through Mr. Rehkopf regarding the following facts he uncovered investigating Mr. Englert during his representation of criminal defendants in *U.S. v. Holt* and *U.S. v. Hurley*:

A.   Englert has no basic qualifications in physics, chemistry, biology or algebra;

B.   Englert is not a "scientist" but was allowed to testify without objection in petitioner's trial about scientific "principles" and opinions to a "reasonable degree of scientific certainty;"

C.   Englert's testimony in petitioner's trial that the purported "high velocity" impact spatter that he testified he observed, could not have been caused by anything <u>but</u> a gunshot wound, would have been contradicted by numerous examples of his own prior sworn testimony;

D.   That had petitioner's trial counsel followed up on Dr. Michael Graham's comments about Englert (which was the proverbial "red flag"), after interviewing Dr. Graham, Englert's lack of scientific background would have been readily exposed; and

E.   That the key issue in petitioner's trial, whether or not CPR could have caused what Englert claimed was "high velocity" blood-spatter patterns on petitioner's clothing, had in fact been testified to by

20

Englert numerous times, contrary to his sworn testimony at petitioner's trial.

Given the obvious importance of Mr. Englert's testimony to the prosecution's case, an effective advocate would have conducted a similar investigation to Mr. Rehkopf's inquiries and uncovered the same powerful evidence to discredit this witness.  As Mr. Rehkopf indicated at the 29.15 proceeding, he began investigating Mr. Englert in connection with his representation of Kevin Holt in 2000.  Mr. Rehkopf conducted simple internet and Westlaw searches that led him to several sources of information that could have been utilized by trial counsel in this case to attack Mr. Englert's credentials, credibility, and his qualifications to testify as an expert.  (29.15 L.F. 128).  Mr. Rehkopf prepared a forty page chart and report that indicated all of the areas where a reasonably competent trial attorney, having conducted the same investigation as he did, could have attacked Mr. Englert's qualifications and credibility.  (*Id*. 144-183).

Although he passed himself off as a scientist, Mr. Englert admitted in a prior case that he is not a scientist and has no scientific background.  (*Id*. 145-146, 152, 160).  As early as 1996, Englert was exposed as a charlatan and a liar.  (*Id*. 161). For instance, in a 1994 case, Englert gave an astonishingly ridiculous opinion that

a man who died from thirty-two hammer blows to his head committed suicide. (*Id*. 154-155, 161).

On the issue of *Strickland* performance, trial counsel learned before trial from Dr. Michael Graham, the well respected St. Louis County Medical Examiner, he should be wary of Mr. Englert's testimony. (*Id*. 162). A reasonably competent attorney, after being alerted to this red flag by Dr. Graham, would have investigated Mr. Englert's background further and uncovered the same powerful evidence uncovered by Mr. Rehkopf. *See Rompilla v. Beard*, 545 U.S. 374 (2005). Dr. Graham specifically referred trial counsel to Dr. Herbert MacDonell, the foremost blood spatter expert in the country. (29.15 L.F. 163). Thus, it is not a close question that trial counsel's failure to contact Professor MacDonell, and pursue other leads through internet searches and investigation of Mr. Englert was professionally unreasonable and constituted deficient performance under *Strickland*. *See Hinton v. Alabama*, 571 U.S. ___ (2014) (Slip op. at 11-12) (failure to perform basic research on an issue fundamental to the case "is a quintessential example of unreasonable performance under *Strickland*.").

A reasonably competent attorney would have also challenged the admissibility of Mr. Englert's testimony in a pretrial *Frye* hearing. Even if a *Frye* challenge would not have succeeded in excluding Mr. Englert's testimony in its entirety, this pretrial hearing would have almost certainly resulted in the exclusion

of the incriminating and misleading testimony regarding Mr. Englert's use of luminol to establish the presence of blood and high velocity mist. (Tr. 634-636). Had a pretrial hearing been conducted, Mr. Englert would have been precluded from testifying that luminol testing conclusively establishes the presence of blood. *See State v. Daniels*, 179 S.W.3d at 280-285. Counsel was also ineffective in not recognizing and confronting Mr. Englert with the fact that spraying lunimol on an item will create a false appearance of mist because luminol is sprayed on an item as a mist. *See Elmore v. Ozmint*, 661 F.3d 783 (4th Cir. 2011) (finding trial counsel ineffective in failing to investigate and adequately challenge the state's forensic evidence.).

On the issue of *Strickland* prejudice, it is also beyond dispute that the evidence uncovered by Mr. Rehkopf would have totally discredited Englert in the eyes of the jury. Had trial counsel investigated Englert's background and prior cases, petitioner's jury would have learned that Mr. Englert gave directly contrary testimony in other prior criminal cases. The jury would have also heard that Mr. Englert has no expert qualifications and falsified his academic and professional credentials. Had Mr. Englert been effectively discredited and exposed as a "liar for hire," there is more than a reasonable probability that Mr. Rentfro would have been acquitted. Habeas relief is warranted.

## CLAIM 2

**TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE AND EXPERT TESTIMONY TO ESTABLISH THAT THE ABSENCE OF GUNSHOT RESIDUE ON SHERRI RENTFRO'S LEFT HAND AND THE PRESENCE OF A TRACE AMOUNT OF BARIUM ON PETITIONER'S LEFT HAND WAS NOT INCONSISTENT WITH PETITIONER'S THEORY OF DEFENSE THAT SHERRI RENTFRO COMMITTED SUICIDE. HAD THESE GUNSHOT RESIDUE ISSUES BEEN INVESTIGATED AND PRESENTED TO THE JURY, THERE IS A REASONABLE PROBABILITY THAT THIS PETITIONER WOULD HAVE BEEN ACQUITTED.**

In addition to the now discredited expert testimony of Mr. Englert, the prosecution also misled the jury regarding the significance of the gunshot residue (GSR) evidence in order to attack petitioner's theory of defense. At trial, prosecution witness Nicholas Gerhardt testified that, in his opinion, there was no GSR on Mrs. Rentfro's hands. (Tr. 550-553). Gerhardt also testified that, although he found a small amount of barium on the back of Mr. Rentfro's left hand, he could not conclude that GSR was present or that petitioner fired a gun. (*Id*. 552-558). The prosecution also presented evidence of an experiment where an officer fired a similar .40 caliber Glock pistol. Subsequent GSR tests on this officer's hands were positive. (*Id*. 388-391, 506-509). During closing argument, the prosecuting attorney emphasized that this gunshot residue experiment coupled with the barium found on the petitioner's left hand indicated that it was clear that

petitioner fired a gun and was able to eliminate most of the gunshot residue because he later washed his hands.  (Arg. Tr. 66-67).

On the issue of deficient performance, it is clear that a reasonably competent attorney could have effectively neutralized any incriminating impact of the GSR evidence in this case had he conducted a reasonable investigation and presented available evidence.  The barium on petitioner's left hand could have been easily explained by evidence that this trace amount could have come from the bag where he stored the gun when he grabbed it.  This bag contained many guns and these guns were frequently fired by petitioner and placed in the bag thereafter.  That same bag also contained spent cartridges and a gun cleaning kit.  The importance of barium on petitioner's left hand could have also been neutralized had it been pointed out that it would have been unlikely that petitioner would have fired a gun with his left hand because he is right-handed.

The insignificance of the absence of GSR on Mrs. Rentfro's left hand could have also been demonstrated to the jury by competent counsel.  It is well settled in the forensic scientific community that the presence or absence of GSR on a person's hand does not prove one way or another whether he or she discharged a firearm.  *See, e.g.*, M. Trimpe, *The Current Status of GSR Examinations*, FBI Law Enforcement Bulletin, (May 2011), p. 29.  In addition, because the cause of death was a contact wound, no GSR would have been emitted from the barrel of the

Glock handgun at the time it was fired.[4]  Finally, the ejection port for this model of Glock pistol is on the right side of the weapon, which would have been pointing away from Mrs. Rentfro's left hand when she shot herself.[5]

More importantly, there is an emerging consensus in the forensic and scientific community that the presence or absence of GSR on a shooting victim's hand can never prove whether the subject is a victim of a suicide, a homicide, or an accident.  See Summary of the FBI Laboratory's Gunshot Residue Symposium, May 31 - June 3, 2005, 8 Forensic Sci. Communications, #3.  Available at: http://www2.fbi.gov/hq/lab/fsc/backissu/july2006/research/2006_7_research01.htm#conclusion.  Even in cases where there is no reason to suspect any other cause of death than suicide in which a gun was used, GSR particles are not always found on the victim's hand.  Two separate studies, one from Virginia and one from Ohio, show that GSR testing was negative in eight to twenty-one percent of cases where the victim committed suicide with a gun.  *Id*. at ¶ 2-5.

On the issue of prejudice, it is not a close question that, had the gunshot residue evidence been effectively neutralized and Mr. Englert been totally discredited, there is more than a reasonable probability of acquittal.  Habeas relief is warranted.

---

[4]   http://www.suntimes.com/m/21989414-773/cpds-responses-to-questions-regarding-the-death-of-catherine-weiland.html

[5]   http://us.glock.com/products/model/g22

## CLAIM 3

**TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE OF SHERRI RENTFRO'S MENTAL HEALTH PROBLEMS AND HER PRIOR SUICIDE ATTEMPT.   HAD THIS EVIDENCE BEEN PRESENTED, THERE IS A REASONABLE PROBABILITY THAT PETITIONER WOULD HAVE BEEN ACQUITTED.**

Petitioner's trial counsel was informed prior to trial that Sherri Rentfro had prior mental health problems and had attempted suicide once before.  Despite this knowledge, trial counsel inexplicably failed to present any evidence regarding Mrs. Rentfro's fragile mental state and her prior suicide attempt.  This information would have provided powerful evidence to the jury to corroborate petitioner's defense that Mrs. Rentfro committed suicide.

In light of the importance of this evidence to the defense, it is not a close question that trial counsel's performance was objectively deficient in failing to investigate and present this obviously relevant and important evidence.  On the issue of prejudice, this exculpatory evidence, coupled with the aforementioned issues relating to the lack of credibility of both Mr. Englert and the gunshot residue experiment, would have further undermined confidence in the outcome of the trial. Habeas relief is warranted.

## CLAIM 4

**TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE AND EXPERT TESTIMONY TO CONTRADICT THE TESTIMONY OF MEDICAL**

**EXAMINER MARY CASE THAT PERSONS WITH A BAC OF .399 WOULD LIKELY BE UNCONSCIOUS OR DEAD.**

Medical Examiner Dr. Mary Case, after performing the autopsy of Mrs. Rentfro, testified at trial that Mrs. Rentfro's blood-alcohol content (BAC) was .399. (Tr. 690). Dr. Case also testified that, in her experience, many people would be dead or lose consciousness at this level of intoxication. (*Id*. 693-694). The prosecutor, during closing argument, emphasized that this testimony from Dr. Case provided conclusive evidence that this was a murder instead of a suicide because it would not have been possible for Mrs. Rentfro to be conscious with this high of a BAC and that petitioner murdered his wife by shooting her in the head while she was unconscious. (Arg. Tr. 21-22, 64-65).

In light of the importance that the prosecution placed on this evidence, a reasonably competent attorney would have presented available evidence and expert testimony to indicate that it was quite possible and even likely that Mrs. Rentfro could function at that level of intoxication. Trial counsel knew that Mrs. Rentfro was an alcoholic and drank heavily. As a result, it would have been easy to establish through both lay and expert testimony that a heavy drinker or an alcoholic like Mrs. Rentfro could very easily function at a BAC level that would incapacitate many average persons. On the issue of prejudice, had Dr. Case's testimony been effectively challenged with this available evidence, coupled with the other

evidence discrediting Mr. Englert and the GSR evidence, there is a reasonable probability that petitioner would have been acquitted.  Habeas relief is warranted.

## CLAIM 5

**PETITIONER'S CONVICTIONS WERE SECURED IN VIOLATION OF THE FOURTEENTH AMENDMENT DUE TO THE PROSECUTOR'S IMPROPER CLOSING ARGUMENTS EXPRESSING HIS PERSONAL OPINIONS OF PETITIONER'S GUILT BASED UPON FACTS NOT IN EVIDENCE.**

During closing argument, the prosecutor told the jury that, based on his forty years of experience as a prosecutor:  "You don't see many women commit suicide shot in the face.  You don't see many of them completely naked."  (Arg. Tr. at 18, 21).  No evidence had been presented at trial that female suicides by gunshot or while naked are unusual or rare.

It is clearly improper for a prosecutor to argue facts not in evidence or imply he has personal knowledge of facts that indicate the defendant is guilty.  *See United States v. Leon-Reyes*, 177 F.3d 816, 823 (9th Cir. 1999); *Copeland v. Washington*, 232 F.3d 969, 975-976 (8th Cir. 2000).  A prosecutors' duty in a criminal proceeding is to seek justice.  *Berger v. United States,* 295 U.S. 78, 88 (1935).  Although the prosecutor should "prosecute with earnestness and vigor," he may not use "improper methods calculated to produce a wrongful conviction."  *Id.* Indeed, it is also well established that a prosecutor must not argue to a jury by appealing to its passion or prejudice. *See* ABA Standards for Criminal Justice §3-

5.8(c) (2d ed. 1982).  Ordinarily, the use of such methods is grounds for reversal of a conviction or sentence if it results in an unfair trial violating the Due Process Clause.  Reversal is required where, as here, a prosecutor's comments have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Berger*, 295 U.S. at 88.

The prosecution's arguments were calculated to remove rationality and reason from the jury's deliberations.  Due to the totally circumstantial nature of the state's case, these arguments were clearly prejudicial.  Habeas relief is warranted.

## <u>CONCLUSION</u>

WHEREFORE, petitioner Kevin Rentfro, prays:

1.     That a writ of habeas corpus be directed to respondent;

2.     That the State of Missouri be required to appear and answer the allegations in this petition;

3.     That Mr. Rentfro be afforded reasonable discovery and an evidentiary hearing on the allegations of this petition;

4.     That after a full and fair hearing, Mr. Rentfro be discharged from his unconstitutional convictions and sentences of life imprisonment;

5.     That petitioner be allowed such other and further relief as may seem just, equitable and proper under the circumstances.

Respectfully submitted,


/s/ Kent E. Gipson
KENT E. GIPSON, #34524
Law Office of Kent Gipson, LLC
121 East Gregory Boulevard
Kansas City, Missouri  64114
816-363-4400 ● Fax 816-363-4300
kent.gipson@kentgipsonlaw.com

COUNSEL FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2014, the foregoing was electronically filed using the CM/ECF system, which sent notification to all counsel of record.

/s/ Kent E. Gipson
Counsel for Petitioner