UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KEVIN RENTFRO, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 4:13CV1425 JCH |
| | ) |
| JEFF NORMAN, | ) |
| | ) |
| Respondent. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Missouri State prisoner Kevin Rentfro's first amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On January 26, 2001, a jury in the Circuit Court of St. Charles County, Missouri, found Petitioner guilty of one count of murder in the second degree, and one count of armed criminal action.  On May 21, 2001, Petitioner was sentenced to concurrent terms of life imprisonment.  The Missouri Court of Appeals affirmed the convictions and sentence.  *State v. Rentfro*, 83 S.W.3d 28 (Mo. App. 2002).

Petitioner filed a *pro se* motion for post-conviction relief pursuant to Missouri Supreme Court Rule 29.15 on December 19, 2002.  Previously retained counsel Arthur Margulis filed an amended motion for post-conviction relief on February 14, 2003, and a second amended motion on July 11, 2003.  After Petitioner's action languished on the St. Charles Circuit Court's docket for over eight years, the court finally set an evidentiary hearing for July 26, 2011, with the sole issue to be heard the alleged failure of Petitioner's trial counsel to discover and appropriately

pursue distortions, omissions, and misrepresentations made by the State's expert witness, Rodney Englert, as to his qualifications.[1]

On August 9, 2011, Judge Ted House issued findings of fact and conclusions of law, and a judgment denying Petitioner's motion for post-conviction relief.[2] Petitioner's current counsel, Mr. Kent Gipson, then entered his appearance on Petitioner's behalf, and on September 15, 2011, Mr. Gipson filed a motion for a new trial pursuant to Missouri Supreme Court Rule 78. After Judge House failed to rule on the motion within ninety days, Petitioner filed a timely notice of appeal on December 14, 2011. On November 27, 2012, the Missouri Court of Appeals affirmed the denial of post-conviction relief in a *per curiam* unpublished opinion. *Rentfro v. State*, 391 S.W.3d 30 (Mo. App. 2012).[3]

Petitioner is currently incarcerated at the Jefferson City Correctional Center in Jefferson City, Missouri. In the instant first amended petition for writ of habeas corpus, Petitioner raises the following five claims for relief:

(1) That trial counsel was ineffective in failing to investigate and present available evidence to attack the credibility and credentials of the prosecution's blood spatter expert, Rodney Englert;

(2) That trial counsel was ineffective in failing to investigate and present available evidence and expert testimony to establish that the absence of gunshot residue on the victim's left hand, and the presence of a trace

---

[1] During a prehearing conference, Mr. Margulis agreed to waive all of Petitioner's claims for post-conviction relief other than the ineffectiveness claim involving Mr. Englert's qualifications as an expert.

[2] Judge House *sua sponte* issued new findings and conclusions, and an amended judgment, on August 17, 2011.

[3] Petitioner raised two grounds in his post-conviction appeal: that the motion court erred in precluding attorney Donald Rehkopf from testifying regarding Mr. Englert's qualifications as an expert, and that the motion court erred in denying his motion for new trial because petitioner was abandoned by his post-conviction counsel. The Missouri Court of Appeals declined to address Petitioner's second point, however, finding that it was more properly characterized as a claim for ineffective assistance of post-conviction counsel, and as such was "categorically unreviewable."

        amount of barium on Petitioner's left hand, were not inconsistent with Petitioner's theory of defense that the victim committed suicide;

(3)      That trial counsel was ineffective in failing to investigate and present available evidence of the victim's mental health problems and her prior suicide attempt;

(4)      That trial counsel was ineffective in failing to investigate and present available evidence and expert testimony to contradict the testimony of medical examiner Mary Case that persons with a blood-alcohol content (BAC) of .399 would likely be unconscious or dead; and

(5)      That Petitioner's convictions were secured in violation of the Fourteenth Amendment, due to the prosecutor's improper closing argument expressing his personal opinion of Petitioner's guilt based upon facts not in evidence.

(First Amended Petition, PP. 19-30).

Respondent initially claimed several of Petitioner's claims were procedurally defaulted, because although he presented them in both his Rule 29.15 motion and amended motion, he waived the claims by choosing not to proceed with them at the Rule 29.15 hearing. This Court held an evidentiary hearing on May 17, 2016, in order to determine whether Mr. Margulis' waiver of Petitioner's claims of ineffective assistance of trial counsel constituted cause sufficient to overcome Petitioner's procedural default. After receiving testimony from Mr. Margulis, the Court concluded that his performance fell below prevailing professional norms, and further that his deficient performance established cause for the default of Petitioner's claims under *Martinez v. Ryan*, 132 S.Ct. 1309 (2012). The Court found that in order to determine whether Mr. Margulis' failings caused Petitioner prejudice, however, it had to address the underlying claims in Petitioner's amended petition. *See Martinez*, 132 S.Ct. at 1320 ("A finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted.").

This Court therefore held a second evidentiary hearing on July 18, 2016, in order to determine the facts relating to all Petitioner's claims in his First Amended Petition for Writ of Habeas Corpus.  The witnesses at the hearing included Petitioner's trial counsel, Mr. Neil Bruntrager, Mr. Bruntrager's co-counsel,  Mr. James Carmichael, and Mr. John Cayton, who was offered as an expert by Petitioner.

## DISCUSSION

### I. Ground 1

As stated above, in Ground 1 of his petition Petitioner asserts trial counsel was ineffective in failing to investigate and present available evidence to attack the credibility and credentials of the prosecution's blood spatter expert, Rodney Englert.  Petitioner raised this claim before the 29.15 post-conviction motion court, and the court denied the claim as follows:

> The Court then considers Movant's[4] sole claim for relief that Defense Counsel, Mr. Neil Bruntrager, failed to discover and appropriately pursue distortions, omissions and misrepresentations made by State's expert Mr. Rod Englert as to his qualifications.
>
> In presenting his case, Movant has failed to allege or prove any of these supposed "distortions, omission or misrepresentation," and therefore has failed to show any prejudice, even if his allegations as to counsel's conduct were true.
>
> Movant did call trial counsel, Mr. Neil Bruntrager, as a witness at the evidentiary hearing.  Mr. Bruntrager testified as to the preparations he undertook in evaluating Mr. Englert's qualifications.  He testified that he reviewed Englert's *curriculum vitae* and participated in the two depositions of Mr. Englert.
>
> Mr. Bruntrager then contacted the St. Louis Medical Examiner to obtain any available information he had concerning Mr. Englert's qualifications.  Mr. Bruntrager testified that he was put in contact with a Dr. Herbert MacDonnell.  He contacted Dr. MacDonnell because he was considered a leading expert in the field of blood splatter analysis, the same subject to which Mr. Englert was testifying as an expert witness for the State.  Bruntrager testified that he inquired of Dr. MacDonnell as to Mr. Englert's qualifications, and even sought to retain

---

4 Petitioner is referred to as "Movant" by the 29.15 post-conviction motion court.

> MacDonnell as a defense expert.  Dr. MacDonnell was not accepting any new cases so he referred Mr. Bruntrager to his "protégé," Mr. Paul Kish.
>
> Mr. Bruntrager retained Kish as his expert and he testified for the defense at trial.  Mr. Bruntrager testified that he consulted with Kish concerning many aspects of this case, including Mr. Englert's qualifications.  Mr. Bruntrager testified he also contacted two other attorneys who provided him with copies of transcripts of other cases where Mr. Englert had testified.  Mr. Bruntrager studied the examinations of Mr. Englert as to his qualifications, and concluded that any inconsistencies were very minor and insignificant.  Counsel testified that as a matter of trial strategy he chose not to focus on the issue of qualifications, which he felt would not be productive, and instead chose to focus on the actual science and contrasting opinions reached in this case by the expert witnesses.  He testified that he believed that with the help of his expert witness, Paul Kish, the defense case was strong in this area.
>
> The Court finds the level of preparation by Mr. Bruntrager in evaluating Mr. Englert's qualifications to be quite diligent and thorough.  This Court finds no evidence that trial counsel was ineffective.

(Resp.'s Exh. F, PP. 110-111).  While Petitioner focused on appeal on the exclusion of his proffered witness, Mr. Donald Rehkopf, from the 29.15 evidentiary hearing, in its opinion the Missouri Court of Appeals affirmed that he received effective assistance of trial counsel with respect to this claim, as follows:

> Rentfro's specific claim of ineffectiveness was that trial counsel failed to discover and pursue certain "distortions, omissions, and misrepresentations" made by Englert at trial.  Rehkopf's testimony was clearly an attempt to call into question trial counsel's competence in this regard by showing how his own investigation uncovered details about Englert's misrepresentations as to his qualifications and how had trial counsel conducted a similar investigation he could have discovered these same misrepresentations and used them to cross-examine Englert at trial.  Thus, the motion court properly excluded this inadmissible evidence at the evidentiary hearing.
>
> Moreover, we note that no prejudice resulted in the exclusion of Rehkopf's testimony, because the testimony of trial counsel at the evidentiary hearing clearly refuted any claim of ineffective assistance of counsel with respect to an investigation and cross-examination concerning Englert's qualifications.
>
> To establish a claim of ineffective assistance of counsel, Rentfro must show that:  (1) his counsel's performance failed to conform to the degree of skill, care, and diligence of a reasonably competent attorney; and (2) as a result, he was

> prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Skillicorn v. State*, 22 S.W.3d 678, 681 (Mo. banc 2000). To prove prejudice, Rentfro must show there is a reasonable probability that, but for his counsel's poor performance, the result of the proceeding would have been different. *Skillicorn*, 22 S.W.3d at 681. Reasonable decisions made as trial strategy cannot be used as a basis for a claim of ineffective assistance of counsel, no matter how ill-fated such decisions appear in hindsight. *Borst v. State*, 337 S.W.3d 95, 105 (Mo. App. W.D. 2011).
>
> At the evidentiary hearing, trial counsel testified he contacted other attorneys and obtained information from various cases in which Englert had testified. He reviewed the transcripts of Englert's testimony from previous cases, and he obtained information about Englert's qualifications. Although trial counsel acknowledged there were some "minor contradictions" in the various transcripts concerning Englert's qualifications, he ultimately decided not to cross-examine Englert about these at trial because he believed they were "insignificant." In addition, trial counsel testified that because the trial court commented it was convinced Englert was an expert in the presence of the jury, reviewing Englert's qualifications would only bolster that opinion, which would not be to Rentfro's advantage.
>
> While trial counsel chose not to cross-examine Englert concerning inconsistencies or misrepresentations in his claimed qualifications, the trial transcript reveals counsel did question Englert regarding his technique, his compensation as an expert witness, and the fact that he was not present at the scene on the night the victim was shot but instead was basing his conclusions upon a subsequent review of the evidence collected in the investigation. In addition, trial counsel presented testimony from a competing expert witness in support of the defense.
>
> Based upon trial counsel's testimony at the evidentiary hearing, it is clear he did investigate Englert's qualifications, and he determined any inconsistencies were insignificant. Following his investigation, counsel made the strategic decision not to pursue the minor inconsistencies on cross-examination. Thus, we cannot conclude trial counsel's performance in this regard was deficient or ineffective.

(Resp.'s Exh. J, PP. 5-7).

With respect to federal court review of state court conclusions, 28 U.S.C. § 2254 states in pertinent part as follows:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

> prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Skillicorn v. State*, 22 S.W.3d 678, 681 (Mo. banc 2000). To prove prejudice, Rentfro must show there is a reasonable probability that, but for his counsel's poor performance, the result of the proceeding would have been different. *Skillicorn*, 22 S.W.3d at 681. Reasonable decisions made as trial strategy cannot be used as a basis for a claim of ineffective assistance of counsel, no matter how ill-fated such decisions appear in hindsight. *Borst v. State*, 337 S.W.3d 95, 105 (Mo. App. W.D. 2011).
>
> At the evidentiary hearing, trial counsel testified he contacted other attorneys and obtained information from various cases in which Englert had testified. He reviewed the transcripts of Englert's testimony from previous cases, and he obtained information about Englert's qualifications. Although trial counsel acknowledged there were some "minor contradictions" in the various transcripts concerning Englert's qualifications, he ultimately decided not to cross-examine Englert about these at trial because he believed they were "insignificant." In addition, trial counsel testified that because the trial court commented it was convinced Englert was an expert in the presence of the jury, reviewing Englert's qualifications would only bolster that opinion, which would not be to Rentfro's advantage.
>
> While trial counsel chose not to cross-examine Englert concerning inconsistencies or misrepresentations in his claimed qualifications, the trial transcript reveals counsel did question Englert regarding his technique, his compensation as an expert witness, and the fact that he was not present at the scene on the night the victim was shot but instead was basing his conclusions upon a subsequent review of the evidence collected in the investigation. In addition, trial counsel presented testimony from a competing expert witness in support of the defense.
>
> Based upon trial counsel's testimony at the evidentiary hearing, it is clear he did investigate Englert's qualifications, and he determined any inconsistencies were insignificant. Following his investigation, counsel made the strategic decision not to pursue the minor inconsistencies on cross-examination. Thus, we cannot conclude trial counsel's performance in this regard was deficient or ineffective.

(Resp.'s Exh. J, PP. 5-7).

With respect to federal court review of state court conclusions, 28 U.S.C. § 2254 states in pertinent part as follows:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under federal law, in order to prevail on his ineffective assistance of counsel claim, Petitioner must show that his attorney's performance was "deficient," and that the deficient performance was "prejudicial." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. To overcome this presumption, Petitioner must prove that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*

Even if Petitioner satisfies the performance component of the analysis, he is not entitled to relief unless he can prove sufficient prejudice. *Id.* at 694. To do so, Petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Upon consideration the Court finds that with this claim, Petitioner fails to demonstrate that his counsel's performance was deficient. During the evidentiary hearing held by this Court, Mr. Bruntrager testified that upon learning the prosecutor planned to offer a blood spatter expert, he contacted Dr. Michael Graham, the medical examiner for the City of St. Louis. (Evidentiary

Hearing Transcript, PP. 57, 81). Mr. Graham indicated there was "some controversy" about Mr. Englert, and suggested that Mr. Bruntrager contact Dr. Herb MacDonell, a noted blood spatter expert. (*Id.*, P. 58). When Mr. Bruntrager contacted Dr. MacDonell he declined to take the case, but referred Mr. Bruntrager to Mr. Paul Kish. (*Id.*, PP. 58-59). Mr. Bruntrager then received information from Mr. Kish and others regarding an investigation they were doing into Mr. Englert's background. (*Id.*, PP. 60-61, 63, 83). Mr. Bruntrager acknowledged during the evidentiary hearing that he did not challenge Mr. Englert's qualifications as an expert, but explained this was because the trial judge ruled he was an expert "before I had a chance to even ask the question." (*Id.*, P. 64; *see also* P. 84 ("And I will tell you I was focused more on the techniques than I was the credentials. Primarily because he testified so many times, the likelihood of Judge Cundiff, who was our trial judge, in some way, shape or form, excluding the testimony of Englert because of his credentials were nonexistent."); P. 90).[5] When asked during cross examination what his trial strategy was to overcome Mr. Englert's opinion, Mr. Bruntrager testified as follows:

> Paul Kish was my trial strategy. Mr. Englert was a—an accomplished witness. If you look at the trial transcript, and I know you have, it took him a paragraph to say yes. All right? He would talk and talk and talk and talk. If you simply got into an argument with him, he was going to—you were going to lose him in every instance given his ability to explain what was going on. He would always find some facts, some factor, something or another that was going to make this case different from other cases, and that's why his opinion would stand in this.
>
> So you don't get into arguments with experts. You don't. They are the experts. What you do is you get your own expert and you rebut them through your own expert.[6] And that was the strategy in this case….

---

5 Mr. Bruntrager testified that he did file motions in limine to exclude Mr. Englert's opinions, but they were denied. (Evidentiary Hearing Transcript, P. 89).

6 As one example of such rebuttal, Mr. Bruntrager noted that while Mr. Englert testified the blood spatter was caused by the high velocity impact from the weapon being discharged, Mr. Kish countered it could have been caused by expirated blood from the mouth-to-mouth resuscitation performed by Petitioner on the victim. (Evidentiary Hearing Transcript, P. 88).

> Don't argue with Englert. In fact, in preparation for this, while I don't have my notes, Jim Carmichael, who was my co-counsel in the matter, has his. And one of the things we talked about time and again was get in and get out. Don't let him explain; get in and get out. In fact, that's in his trial notes, as he sat next to me at counsel table.[7]

(*Id.*, PP. 88, 90).

This Court agrees with the post-conviction motion court and the Missouri Court of Appeals that Mr. Bruntrager's preparation was thorough, and that his decision to attack Mr. Englert's conclusions rather than his qualifications was an appropriate choice of trial strategy. *See Becker v. Luebbers,* 578 F.3d 907, 920 (8th Cir. 2009) (quoting *Strickland*, 466 U.S. at 690) ("'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'"), *cert. denied*, 561 U.S. 1032 (2010). As such, the decision of the state courts that counsel was not ineffective for failing to investigate and present evidence to attack the credibility and credentials of the prosecution's blood spatter expert, Rodney Englert, was neither contrary to nor an unreasonable application of clearly established federal law, nor did it result in a decision based on an unreasonable determination of the facts in light of the evidence presented. Ground 1 of Petitioner's § 2254 petition must therefore be denied.[8]

## II.   Ground 2

As stated above, in Ground 2 of his petition Petitioner asserts trial counsel was ineffective in failing to investigate and present available evidence and expert testimony to establish that the absence of gunshot residue on the victim's left hand, and the presence of a trace

---

[7] Mr. Carmichael confirmed this strategy through his own testimony at the evidentiary hearing. (Evidentiary Hearing Transcript, P. 110).

[8] In light of the Court's above ruling, it need not consider whether any alleged deficiency on Mr. Bruntrager's part caused Petitioner prejudice.

amount of barium on Petitioner's left hand, were not inconsistent with Petitioner's theory of defense that the victim committed suicide. Upon consideration the Court again finds that with this claim, Petitioner fails to demonstrate his counsel's performance was deficient. During his direct examination at the evidentiary hearing, Mr. Bruntrager testified that while he did not recall any opinion being offered that the location of the ejection port of the gun could explain the lack of gunshot residue on the victim's hand, there was testimony that because it was a "close contact wound," the "drift would have been blown into the wound itself." (Evidentiary Hearing Transcript, P. 68). On cross examination, Mr. Bruntrager stated that he filed a motion in limine, challenging why the test for gunshot residue on Petitioner was deemed "inconclusive", when the antimony level found did not meet the threshold level established by the FBI. (*Id.*, P. 96). Mr. Bruntrager further testified that prior to trial he deposed Mr. Nicholas Gerhardt, the forensic chemist from the Missouri Highway Patrol who performed the gunshot residue examinations on Petitioner and the victim, and determined that he did not need to hire an expert on gunshot residue because he was able to get what he needed from Mr. Gerhardt himself. (*Id.,* PP. 67, 97-98).[9] Specifically, Mr. Bruntrager testified as follows:

> Q    But you didn't believe that you needed to call a separate expert to testify about Mr. Gerhardt's results?
>
> A    I did not. I had gotten what I needed from that expert.
>
> Q    And, again, I guess why did you believe that you didn't need to contact another expert?
>
> A    Because this expert had testified that he couldn't say whether or not [victim] Sherri Rentfro had fired the weapon and he couldn't say whether Kevin fired the weapon. He also—while he did try to equivocate a little bit on the threshold questions, you didn't have the threshold because you needed both of them

---

9 According to Mr. Bruntrager, Petitioner never requested that he retain the services of a gunshot residue expert. (Evidentiary Hearing Transcript, P. 69).

> [barium and antimony]. So in either instance, he—again, I think he impeached himself, but we made it clear that the thresholds were not met.
>
> Q   And certainly if you would have called an expert, you would anticipate the expert's testimony would have been the same as Mr. Gerhardt's?
>
> A   I would have expected that, yes.

(*Id.*, P. 98).

Mr. Bruntrager then testified at length regarding his treatment of Mr. Carl Rothove, the State's expert on gunshot residue, and confirmed that he deposed Mr. Rothove before trial. (Evidentiary Hearing Transcript, P. 99). He then explained that he elicited testimony from Mr. Rothove at trial that both environmental factors and the type of weapon involved can impact gunshot residue, and also that the presence of barium on Petitioner's hand could be explained by the fact that Petitioner touched the gun on the night in question, pushing it away from the victim after it had been discharged. (*Id.*, PP. 99-100). Finally, Mr. Bruntrager recalled that Mr. Rothove testified the victim might not have had residue on her hand, even if she were the one who fired the weapon, because of the tight nature of the wound. (*Id.*, PP. 101-102). Mr. Bruntrager's testimony on this issue concluded as follows:

> Q   So would you have had a reason, based on all of the evidence that you were able to ask the State's gunshot residue expert about, to have a reason to call an expert of your own to testify to this?
>
> A   No, ma'am. I had gotten the information that I needed from their own witness who was law enforcement. And getting that I thought was going to carry more weight than bringing in your own.
>
> Q   In your experience with juries, is it—is it better from a defense standpoint to have the State's expert witnesses concede issues with you than calling a different one?
>
> A   Yes, ma'am. If you can, yes.

(*Id.*, P. 102).

Upon consideration of the foregoing, the Court again finds Mr. Bruntrager's actions in this regard were the result of reasonable professional judgment, and as such easily fell within the wide range of competent assistance sanctioned by *Strickland*.  The Court therefore does not find that counsel was ineffective for failing to investigate and present available evidence and expert testimony to establish that the absence of gunshot residue on the victim's left hand, and the presence of a trace amount of barium on Petitioner's left hand, were not inconsistent with Petitioner's theory of defense that the victim committed suicide.  Ground 2 of Petitioner's § 2254 petition must therefore be denied.[10]

### III.  Ground 3

As stated above, in Ground 3 of his petition Petitioner asserts trial counsel was ineffective in failing to investigate and present available evidence of the victim's mental health problems and her prior suicide attempt.  Upon consideration the Court again finds that with this claim, Petitioner fails to demonstrate that his counsel's performance was deficient.  During the evidentiary hearing, Mr. Bruntrager testified that while Petitioner said "there had been a suicide attempt when [the victim] was in her teens", he provided "absolutely no information" regarding the circumstances of the alleged attempt.  (Evidentiary Hearing Transcript, P. 69).  Mr. Bruntrager confirmed that he made no effort to obtain the victim's medical records, explaining that he had no information regarding whether or even if the alleged attempt had occurred.  (*Id.*, PP. 69-70).[11]  Mr. Bruntrager elaborated during cross examination as follows:

> Well, when we say [the conversations about the alleged prior suicide attempt] were not detailed, Kevin said that he had heard, although he had no attributable source, he had heard that she had—I think he said when she was a teenager, had

---

10 Again, in light of the Court's above ruling it need not consider whether any alleged deficiency on Mr. Bruntrager's part caused Petitioner prejudice.
11 Mr. Bruntrager stated that he pressed Petitioner for details, but "there were none." (Evidentiary Hearing Transcript, P. 70).

> attempted suicide. But never any reason—not reason. Never any method or cause or where or even with certainty that it had happened.
>
> And so, again, this is 2001 [when the trial took place]. You can't do an Internet search. You know, I don't even know how you would even find that information, other than perhaps reaching out to the family and saying to the family and here we go. But my concern, of course, was and always had been I don't want the family to come testify because they are obviously a sympathetic figure. I want them out of this mix. So we had no way to independently verify what was going on. Again, it is also very remote in time.
>
> From what—my recollection was Sherri Rentfro was either 30 or 31 at the time of her death. And if she had been a teenager, again, and it was an attempt, you know, again, that was just too remote in time. But I remember talking to him about whether or not there had been any kind of counseling or any of that sort of thing. And he indicated that there wasn't. At least I don't remember him telling me that there was. There was no trail of records that I could find here that would have allowed me to go down that path….
>
> And then one final thing. I was also very concerned that if I opened the door regarding any of these issues, there were a couple of incidents that I had kept out, that I had filed motions in limine to preclude from the evidence that I was successful in doing that had to do with Kevin's relationship with her and the volatility of that relationship. And I was really concerned that if we started to open those doors, somehow that would come in.
>
> So all of those things played into our thought process. But most importantly, I just didn't have enough information.[12]

(*Id.*, PP. 102-104).

The Court finds that with his testimony, Mr. Bruntrager established that he exercised reasonable professional judgment in his treatment of the alleged suicide attempt. In other words, he considered pursuing the line of defense, but decided not to for two reasons; first, because he worried such information would open the door to unwelcome testimony regarding the volatile nature of the relationship between Petitioner and the victim, and second, because he simply did not have enough information to go on to investigate the allegation thoroughly. Under these

---

[12] Again, Mr. Carmichael confirmed that while Petitioner was "vaguely aware that there had purportedly been a suicide attempt", he did not have any specifics about it. (Evidentiary Hearing Transcript, PP. 111-112).

circumstances, the Court finds counsel's actions fell within the wide range of professionally competent assistance sanctioned by *Strickland*, and so Ground 3 of Petitioner's § 2254 petition must be denied.[13]

## IV. Ground 4

As stated above, in Ground 4 of his petition Petitioner asserts trial counsel was ineffective in failing to investigate and present available evidence and expert testimony to contradict the testimony of medical examiner Mary Case that persons with a blood-alcohol content (BAC) of .399 would likely be unconscious or dead. During the evidentiary hearing and in his post-hearing brief, Petitioner further advanced the argument that counsel was ineffective for failing to investigate the discrepancy between the victim's blood alcohol and vitreous fluid levels.[14]

Upon consideration the Court again finds that with these claims, Petitioner fails to demonstrate that his counsel's performance was deficient. With respect to the difference between the blood alcohol and vitreous fluid levels, during the evidentiary hearing Mr. Bruntrager testified that he deposed Dr. Case prior to trial, and specifically asked her about both the blood alcohol result from the blood test and the vitreous humor test result. (Evidentiary Hearing Transcript, PP. 91-92). Mr. Bruntrager questioned Dr. Case during the deposition as to why the vitreous result was far lower than the blood draw, and he recalled her answer as follows:

---

13 As further support for its ruling the Court notes that during Petitioner's sentencing hearing, the trial court questioned Petitioner regarding his attorney's performance. Petitioner testified under oath that he believed Mr. Bruntrager had investigated the case thoroughly, and had talked to all the witnesses Petitioner mentioned. (Sentencing Hearing Transcript, ECF No. 70-4, P. 11). Furthermore, while Petitioner complained about "some evidentiary items that were not brought up", he did not mention any failure to investigate or pursue a line of defense based on the victim's alleged prior suicide attempt. (*Id.*, PP. 11-12).

14 Respondent asserts this latter claim must be denied as untimely and procedurally barred. (Respondent's Post Hearing Brief and Supplemental Response, PP. 20-24). The Court need not address this assertion, however, as the claim fails on the merits.

> A    Her answer was that the—the difference, while significant, was a matter of Sherri Rentfro having been able to metabolize the alcohol. And that is consistent with the medicine as I know it, with the science as I know it.
>
>      So if we have a blood alcohol content of .399, her vitreous content was .183 and .189, whatever it was. And it was simply a question if she had metabolized all of the alcohol at that point.
>
> Q    So, in fact, based on your examination of Ms. Case and your knowledge and background on this, it was accepted that the BAC level would actually be higher than the vitreous level?
>
> A    Yeah, yes under the circumstances. And, again, that would not have been—that would not have been something I would have challenged because I think the science was right.

(*Id.*, PP. 92-93). With respect to testimony regarding the high BAC level, Mr. Bruntrager stated that he filed a motion in limine, to ensure Dr. Case would not be permitted to offer an opinion that with such a high BAC, this particular victim would have been unconscious. (*Id.*, P. 93). He also elicited testimony during the trial that Dr. Case had in fact seen people with a .50 blood alcohol content operate motor vehicles, and people with a .60 level walk. (*Id.*). These garnered admissions in turn explained his decision not to retain his own expert on the subject, as again he explained that it is better to obtain concessions from the State's experts. (*Id.*, P. 94).[15] The Court finds Mr. Bruntrager's actions in this regard fell well within the wide range of professionally competent assistance sanctioned by *Strickland*, and so Ground 4 of Petitioner's petition must be denied.

## V.    Ground 5

---

15 Mr. Bruntrager explained his strategy as follows: "I mean, you are getting what you need from their own expert. You are getting in cross-examination what you need from this person. If you put in your own expert, you are going to still get that information so now you have gotten it twice. But you have also now opened that expert to cross-examination. And there were several things that she [Dr. Case] was saying that we didn't want to hear twice. So, again, there was no point in doing that. We got it through this expert." (Evidentiary Hearing Transcript, P. 94).

As stated above, in Ground 5 of his petition Petitioner asserts his convictions were secured in violation of the Fourteenth Amendment, due to the prosecutor's improper closing argument expressing his personal opinion of Petitioner's guilt based upon facts not in evidence. Petitioner raised this claim on direct appeal of his conviction, and the Missouri Court of Appeals denied the claim as follows:

> Appellant[16] argues that the trial court erred in overruling his objection to the prosecuting attorney's statement that women rarely shoot themselves in the head or commit suicide when they are naked because that argument was improper and deprived Appellant of his right to a fair trial, in that the argument (1) insinuated that the prosecuting attorney had personal knowledge of facts making it unlikely that Victim committed suicide and (2) was calculated and likely to mislead the jury regarding the pivotal issue of whether Victim shot herself or was shot by Appellant.
>
> Prosecutors may comment on the evidence and the reasonable inferences to be drawn from the evidence, as long as they do not imply knowledge of facts not before the jury. Ferguson, 20 S.W.3d at 501-502.  There was no evidence before the jury in this case regarding the frequency with which women commit suicide while naked or by shooting themselves in the face.  We find that the prosecutor's comment did imply knowledge of statistics regarding methods of and circumstances regarding women's suicide not before the jury.  However, we do not find that Appellant was prejudiced by the trial court's allowance of this argument, because of the substantial physical evidence and expert testimony regarding that evidence implicating Appellant as Victim's killer.  This evidence includes the absence of gunshot residue and blood spatter on Victim's left hand, and the position of her left hand, which indicated she did not shoot herself.  There was no evidence that her hand had been wiped down or moved after the shooting. There was expert testimony by Gerhardt that someone can fire a gun and have barium levels on his hand, but only trace elements of antimony.  Such was the case with Appellant, who additionally wiped his hands prior to the gunshot residue test.  Such wiping can decrease the amount of antimony significantly. There was expert testimony that the blood spatter evidence revealed that Appellant could not have been standing where he said he had been standing at the time Victim allegedly shot herself.  Englert testified that in his opinion, based on the blood spatter evidence on which he is an expert, Victim did not shoot herself.
>
> Based on the foregoing, we find that the trial court did not abuse its discretion in overruling Appellant's objection to the prosecutor's statements in closing argument.  Point V is denied.

---

16 Petitioner is referred to as "Appellant" by the Missouri Court of Appeals.

(Resp. Exh. E, PP. 13-14).

As stated above, with respect to federal court review of state court conclusions, 28 U.S.C. § 2254 states in pertinent part as follows:

> (d)      An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Upon consideration, the Court finds the decision of the state court that Petitioner's convictions were not secured in violation of the Fourteenth Amendment due to the prosecutor's improper closing argument, was neither contrary to nor an unreasonable application of clearly established federal law, nor did it result in a decision based on an unreasonable determination of the facts in light of the evidence presented. *See United States v. Barrera*, 628 F.3d 1004 (8th Cir. 2011).  Ground 5 of Petitioner's § 2254 petition must therefore be denied.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's First Amended Petition for a Writ of Habeas Corpus (ECF No. 8) is **DENIED**, and his claims are **DISMISSED** with prejudice.  A separate Order of Dismissal will accompany this Memorandum and Order.

- 18 -

**IT IS FURTHER ORDERED** that because Petitioner cannot make a substantial showing of the denial of a constitutional right, the Court will not issue a certificate of appealability.  See *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997), *cert. denied*, 525 U.S. 834 (1998).


Dated this 9th Day of September, 2016.


/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE